Mark E. Andrews (TX Bar No. 01253520)
Jeffrey R. Fine (TX Bar No. 07008410)
Aaron M. Kaufman (TX Bar No. 24060067)
Jane Gerber (TX Bar No. 24092416)
**DYKEMA COX SMITH**
1717 Main Street, Suite 4200
Dallas, TX  75201
Phone: (214) 462-6400
Fax: (214) 462-6401
Email: mandrews@dykema.com
Email: jfine@dykema.com
Email: akaufman@dykema.com
Email: jgerber@dykema.com

**COUNSEL FOR PLAINTIFF PREFERRED CARE PARTNERS MANAGEMENT GROUP, L.P.**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| **In re:**<br><br>**PREFERRED CARE PARTNERS MANAGEMENT GROUP, L.P., et al.,**<br><br>DEBTORS. | **CHAPTER 11 CASE**<br><br>**CASE NO. 17-44741-mxm-11**<br><br>** Previously Case No. 17-34296**<br><br>(Jointly Administered) |
| **PREFERRED CARE PARTNERS MANAGEMENT GROUP, L.P.,**<br><br>PLAINTIFF,<br><br>VS.<br><br>**QUINTAIROS, PRIETO, WOOD & BOYER, PA**<br><br>DEFENDANT. | **Adversary No. _____** |

## ORIGINAL COMPLAINT

Debtor Preferred Care Partners Management Group, L.P. ("PCPMG"), as debtor and debtor-in-possession ("Debtor" or "Plaintiff") in the above captioned chapter 11 bankruptcy case (the "Bankruptcy Case"), hereby files this Complaint and would show as follows:

## I. PARTIES

1.  Plaintiff PCPMG is a Texas limited partnership with its principal place of business located in Plano, Texas. PCPMG is a debtor in possession in the above-referenced Bankruptcy Case.

2.  Defendant law firm Quintairos, Prieto, Wood & Boyer, P.A. ("Quintairos" or "QPWB" or the "Firm") is a Florida Profit Corporation whose primary office is located at 9300 S. Dadeland Blvd, 4th Floor, Miami, Florida 33156. Quintairos may be served through Donald L. Miller, II, its counsel of record in the Kentucky Lawsuit (defined below), or via its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.

## II. SUMMARY OF THE COMPLAINT

3.  This action concerns the Debtor's July 2017 corporate restructuring plan, about which the Debtor has been transparent since the beginning of this Bankruptcy Case (and even before that time). As disclosed in declarations filed several months ago, the Debtor created a new, wholly-owned subsidiary called PCPMG Consulting, LLC ("M-Con") and several other management subsidiaries to hold and perform under management agreements with the operators of the facilities owned by the Preferred Care entities. Since the Debtor's initial bankruptcy filing in November, 2017, the Debtor has produced thousands of pages of records to Quintairos and several other parties to demonstrate the innocuous nature and details of these pre-bankruptcy transactions.

4. In return for the Debtor's transparency, and fully aware of the pending bankruptcy, Quintairos has filed a post-petition state court lawsuit against M-Con, demonstrating its fundamentally misguided understanding of the Debtor's pre-bankruptcy restructuring transactions. This "shoot-from-the-hip" style of litigation has proven costly for the Debtor and its wholly-owned non-debtor subsidiaries.

5. Not only has the Debtor incurred direct legal costs to respond to Quintairos' lawsuit, but M-Con (a non-debtor subsidiary of the Debtor) has incurred significant amounts of time and expense to address these claims, despite their obvious lack of merit, and even *after* the Debtor advised Quintairos that its claims were part of the Debtor's bankruptcy estate and would be administered as such. The time and money spent by the Debtor and its non-debtor subsidiaries to respond to the Kentucky Lawsuit are resources that would otherwise be available to administer this bankruptcy estate and potentially make distributions to the Debtor's creditors. Despite warnings not to proceed, Quintairos' pursuit of the Kentucky Lawsuit causes delay to the administration of this Bankruptcy Case, and actual harm in that virtually every dollar spent defending the Kentucky Lawsuit is a dollar that is no longer available to pay creditors of this bankruptcy estate. Quintairos' overt and willful stay violations must be stopped to prevent further harm.

6. This legal action is necessary to protect the Debtor's estate from an opportunistic law firm that seeks to do end-runs around the bankruptcy process to the detriment of the Debtor's creditors and ongoing operating subsidiaries. By this action, Debtor seeks a determination that the state court lawsuit filed by Quintairos against M-Con (which has been removed to federal court) violates the automatic stay in this Bankruptcy Case. The Debtor seeks sanctions against Quintairos as necessary to prevent further violations of the automatic stay and to put the Debtor

and M-Con in the same economic position that existed before Quintairos' knowing stay violations. Such sanctions should include reimbursement for actual damages as well as injunctions from further actions by Quintairos against the Debtor or its non-debtor management subsidiaries. In the event that the Court determines that the Kentucky Lawsuit is not a technical violation of the automatic stay, the Plaintiff seeks an injunction enjoining the continued prosecution of the Kentucky Lawsuit pending confirmation of a plan.

### III. JURISDICTION AND VENUE

7. Plaintiff commences this proceeding pursuant to Rules 7001 and 7065 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). The Court has jurisdiction over this adversary proceeding pursuant to section 1334(b) of title 28 of the United States Code.

8. The Bankruptcy Court may enter final orders and judgments with respect to all Counts pled in this Complaint, as they are core proceedings under section 157(b)(1) and (b)(2)(A), (G) & (O) of title 28 of the United States Code. To the extent this Complaint pleads Counts which may not be finally adjudicated by a bankruptcy court, the Bankruptcy Court has constitutional authority to enter interlocutory orders and proposed findings of fact and conclusions of law, which may be reviewed *de novo* by the United States District Court.

9. Venue is proper in this District pursuant to section 1409 of title 28 of the United States Code.

### IV. FACTS

*A.    Background*

10. As detailed in the first day declaration of Travis Eugene Lunceford (the "First Day Declaration"), a copy of which is attached hereto as Exhibit 1, the ultimate owners of

KPM and PCPMG are Gary Anderson, Mindy Provence, Gene Lunceford and Michael Tennyson (the "Members").[1]

11. Prior to 2004, the Members were employed by Preferred Care, Inc. ("PCI") or its affiliated entities.

12. Starting in 2004, the Members left PCI to form PCPMG and provide consulting services to PCI and its owner/operator affiliates through several management agreements.

13. In 2012, the Members formed Kentucky Partners Management, LLC ("KPM") to hold management agreements for 21 new facilities acquired by PCI's affiliated owner/operator entities.

14. PCI is owned and controlled, directly or indirectly, by Tom Scott.

15. Tom Scott has no interest in or affiliation with PCPMG or M-Con.

16. As of the time of the bankruptcy filings, PCI and its various affiliates owned and/or operated over 100 skilled nursing, assisted living and independent living facilities in over 10 states. In Kentucky, PCI affiliated entities own and/or operate 21 facilities.

17. Until June 30, 2017, KPM was party to approximately 21 separate management agreements with Kentucky-based affiliates of PCI, and PCPMG was a party to approximately 80 additional management agreements with affiliates of PCI, including at least 12 facilities based in New Mexico. Under such management agreements, the PCPMG and KPM provided consulting services to the owner/operators of the Kentucky and New Mexico-based facilities.

18. On June 30, 2017, the management agreements between KPM and the 21 owner/operators of the Kentucky facilities expired.

19. As part of a long-planned corporate restructuring, on or about July 1, 2017, PCPMG contributed its cash, employees and certain contracts to a newly-created, wholly-owned

---

[1] Mr. Tennyson passed away weeks before the commencement of the Debtors' bankruptcy Cases.

subsidiary called PCPMG Consulting, LLC or M-Con (for short). In exchange for this contribution, M-Con assumed certain liabilities and obligations associated with the employees and vendor service contracts, and entered into separate management agreements to provide services to the newly-created subsidiaries and affiliates. As a result, all persons necessary to perform the services for PCI's affiliates became employed by M-Con.

20. Also as part of this corporate restructuring, because the KPM management agreements expired on June 30, 2017, the Members formed a new company called PCPMG of Kentucky, LLC, and 21 special purpose entities as wholly-owned subsidiaries of PCPMG of Kentucky to enter into new management agreements with the owner/operators of the Kentucky-based facilities. PCPMG of Kentucky is wholly owned by the Members, and it has no employees.

21. M-Con is the only entity under the PCPMG organization structure with employees. Accordingly, pursuant to management agreements between M-Con and the other management subsidiaries, M-Con's employees provide the consulting services necessary to fulfill the management subsidiaries' obligations under the management agreements with the facilities' owner/operators.

### B.    *The Debtors Seek Bankruptcy Protection.*

22. On November 13, 2017 (the "Petition Date"), PCPMG and KPM each filed a voluntary petition under chapter 11 of the Bankruptcy Code. On that same date, PCI and 33 of its owner/operator affiliates also filed chapter 11 petitions. All 36 bankruptcy cases are pending before this Court, although PCI's bankruptcy cases are being administered separately from KPM and PCPMG's Cases.

23. On information and belief, among other reasons, PCI and owner/operator affiliates have sought bankruptcy protection to consummate an orderly transition of the 21 Kentucky-based facilities and 12 New Mexico-based facilities to new owners and operators.

24. M-Con and the Debtor's other management subsidiaries and affiliates are essential to PCI's continued operations. Without M-Con and its staff, the PCI debtors would be unable to complete an orderly transition of the facilities to new owners and operators.

25. Another reason for the bankruptcy filings was the approximately 163 lawsuits previously filed against PCI, KPM and/or PCPMG.

26. Before the Petition Date, Defendant Quintairos appeared in many of those lawsuits as counsel of record on behalf of the defendants.

27. M-Con was not a defendant in any pre-bankruptcy tort lawsuit, and Quintairos never appeared on its behalf.

28. While the Debtors commenced these Cases to obtain some breathing room from the litigation, their ultimate goals in these Cases are two-fold: (i) assist PCI in the orderly transition of the PCI Debtors' facilities to new owner/operators; and (ii) establish a central forum to negotiate a plan of reorganization to provide a meaningful distribution to legitimate creditors while allowing the Debtors to continue operations to the extent they continue to consult for the remaining facilities owned and operated by Tom Scott's non-debtor owner/operators.

C.  *Pre-Petition Defense Provided by Quintairos*

29. Historically, pursuant to existing contracts between PCI affiliates and PCPMG affiliates, PCI and its affiliates provided a defense for the PCPMG affiliates and paid all legal and settlements costs arising from claims brought during the course of PCPMG's work for the PCI owned facilities.

30. On information and belief, Quintairos was aware of the contractual relationship between PCI affiliates and PCPMG affiliates. Also on information and belief, Quintairos only communicated with, and only took direction from, PCI affiliates and PCI's general counsel concerning the claims in which Quintairos appeared as counsel for PCI affiliates as well as PCPMG affiliates. On information and belief, Quintairos did not communicate critical information about the pending lawsuits with PCPMG or KPM.

31. There exists no signed, written agreement between any PCPMG affiliate and Quintairos concerning legal representation of PCPMG or KPM.

32. On information and belief, Quintairos received multiple millions of dollars from PCI and its affiliates for the legal services provided during the course of its representation. On information and belief, neither PCPMG nor KPM paid any portion of those fees.

33. Quintairos never issued an invoice to PCPMG or KPM for legal services provided on their behalf. As such, neither PCPMG nor KPM ever recorded an account payable due to Quintairos for legal services.

34. Most (if not all) of the 33 owner/operator PCI debtors listed Quintairos as a creditor in their respective bankruptcy schedules.

35. On the other hand, neither KPM nor PCPMG listed Quintairos as a creditor in either of their respective bankruptcy schedules.

36. Quintairos never appeared in any lawsuit on behalf of M-Con.

**D.** ***The Kentucky Lawsuit Violates the Automatic Stay.***

37. On or about February 15, 2018, Quintairos filed a lawsuit styled *Quintairos, Prieto, Wood & Boyer, PA v. PCPMG Consulting, LLC,* 18-CI-00102 (the "Kentucky Lawsuit")

in the Commonwealth of Kentucky, Madison Circuit Court ("Kentucky State Court"). A true and correct copy of the complaint filed in the Kentucky Lawsuit is attached hereto as Exhibit 2.

38. Upon filing the Kentucky Lawsuit, Mr. Donald L. Miller, Kentucky Managing Partner for Quintairos, sent an e-mail to PCI's general counsel and Tom Scott's personal counsel with a courtesy copy of the complaint filed in the Kentucky Lawsuit and further advising that Quintairos had "withheld for the time being a claim under KRS 378A.040."[2]

39. The same day, on February 15, 2018, the undersigned counsel issued a letter to Mr. Miller, notifying him that, because the claims asserted in the Kentucky Lawsuit were (by Mr. Miller's own admission) based on derivative and/or fraudulent transfer claims, the Kentucky Lawsuit violated section 362(a)(3) of the Bankruptcy Code and should be dismissed or filed in the Bankruptcy Court. A true and correct copy of such letter is attached hereto as Exhibit 3.

40. Despite multiple requests, Quintairos has refused to dismiss the Kentucky Lawsuit.

41. Debtor's counsel negotiated a 45-day abatement agreement among the Debtor, Quintairos and M-Con to allow for the Kentucky Lawsuit to be removed to federal court while the Debtor provided informal discovery to substantiate the 2017 corporate restructuring for Quintairos. Pursuant to such agreement, M-Con timely removed the Kentucky Lawsuit to the United States District court for the Eastern District of Kentucky (the "Kentucky District Court") on or about March 12, 2018. The removed lawsuit is now pending under Case No. 5:18-cv-

---

[2] KRS § 378A.040 is Kentucky's codification of a fraudulent transfer act. Because Mr. Scott's counsel recognized that M-Con was not a PCI-affiliated entity, he forwarded the courtesy copy to PCPMG's bankruptcy counsel.

00176-KKC, Judge Caldwell presiding. A true and correct copy of the stipulated agreement among the Debtor, Quintairos and M-Con is attached hereto as <u>Exhibit 4</u>.[3]

42. The Debtor has produced thousands of pages of documents to Quintairos under the abatement stipulation.[4]

43. Despite producing thousands of pages of records to Quintairos on March 30, 2018, and the week thereafter, Quintairos decided not to file a proof of claim in PCPMG's Bankruptcy Case.

44. Rather than filing a proof of claim and participating in the bankruptcy process, Quintairos has stood on its allegations that M-Con is liable for breaches of an "implied" contract.[5]

45. On information and belief, Quintairos does not dispute that:

(a) PCPMG and KPM never signed an engagement letter or other agreement to retain Quintairos;

(b) Quintairos never sent an invoice to PCPMG or KPM for legal services; and

(c) Quintairos never obtained actual written consent or a waiver from PCPMG or KPM regarding Quintairos's simultaneous representation of Tom Scott,

---

[3] The 45-day Stay Period (as defined in the stipulation) has terminated. Quintairos has filed a motion to remand. M-Con has filed an answer, a response to the motion for remand and a motion to transfer venue to the Northern District of Texas. PCPMG has filed a motion to intervene as the plaintiff. The Kentucky District Court has not yet ruled on any motions, and all matters remain pending as of the filing of this Complaint.

[4] Quintairos has since filed a motion to remand, M-Con has filed a motion to transfer venue to the Northern District of Texas, and the Debtor has filed a motion to intervene as the plaintiff. All such motions remain pending as of the filing of this Complaint.

[5] Since filing the Kentucky Lawsuit, Quintairos' position has morphed from arguing that a contract was "implied" from PCI's conduct to arguing that there was an actual "service contract" with PCPMG, and that the "service contract" was somehow assumed by M-Con as part of the 2017 restructuring.

PCI and the Preferred Care affiliated entities while also representing PCPMG and KPM.

46. Since February 15, 2018, and prior to filing this action, the Debtor incurred no less than $15,000.00 in legal fees to respond to the Firm's allegations and attempt to resolve the Kentucky Lawsuit amicably. M-Con has also incurred its own legal fees to respond to the Kentucky Lawsuit. In addition to the legal fees, the Debtor and M-Con have had to disrupt their ordinary operations to review and respond to the Kentucky Lawsuit. The Debtor seeks full reimbursement of these expenses, which would not have been incurred but for Quintairos' willful violations of the automatic stay. The Debtor also seeks reimbursement of fees and expenses incurred in connection with filing this Complaint and prosecuting this action.

## V. CAUSES OF ACTION

### A. *Count 1 – Determination that the Kentucky Lawsuit Violates the Automatic Stay*

47. PCPMG repeats and realleges the assertions contained in the foregoing paragraphs 1 – 46 as though fully set forth herein.

48. The automatic stay prohibits the commencement or continuation of an action against Debtor PCPMG or its property. This prohibition prevents third-parties like Quintairos from taking any action to possess, obtain or retain control over property of the estate. 11 U.S.C. § 362(a)(3).

49. Quintairos acknowledges that the claims asserted in the Kentucky Lawsuit are based on fraudulent transfer theories.

50. In the Kentucky Lawsuit, Quintairos is pursuing claims against M-Con, a wholly-owned subsidiary of the Debtor, based on the Debtor's alleged conduct. Specifically, Quintairos has alleged that the Debtor or its former employees misrepresented the nature of the 2017

corporate restructuring and breached an implied contract for legal service. Such claims are not based on any particularized harm to Quintairos; rather such claims are based on alleged generalized harm that, if true, would also be true for all other creditors of the Debtor.[6]

51. Generalized harm to creditors based on the Debtor's alleged misconduct gives rise to claims that belong to the Debtor's bankruptcy estate and cannot be pursued by a single creditor to the detriment of other creditors. The Debtor advised Quintairos of this issue in its letter dated February 15, 2018. In this regard, the Kentucky Lawsuit violates the automatic stay, is void, and continued pursuit of such action by Quintairos constitutes a willful stay violation.

52. Pursuant to Federal Declaratory Judgment Act ("FDJA"), 28 U.S.C. §§ 2201-2202, as well as Bankruptcy Rule 7001(2) & (9), PCPMG requests a declaration of the Court determining that the Kentucky Lawsuit violates the automatic stay, and that Quintairos has willfully violated the automatic stay by refusing to dismiss the Kentucky Lawsuit after having ample notice and opportunity to do so.

### B.  *Count 2 – Award of Damages*

53. PCPMG repeats and realleges the assertions contained in the foregoing paragraphs 1 – 52 as though fully set forth herein.

---

[6] By way of example, in the Kentucky Lawsuit, Quintairos references a letter from the President and CEO of M-Con, dated June 20, 2017, as evidence of specific harm because the letter references only a name change from Preferred Care Partners Management Group, LP to PCPMG Consulting, LLC, without detailing the corporate restructuring that was underway at the time. There are many problems with Quintairos' use of this letter as evidence of specific harm. First, Quintairos can never prove that it was an actual (or even an intended) recipient of this letter. On its face, the letter has no recipient. The Debtor or M-Con will show that the letter was issued to the Debtor's list of known vendors. As evident from the Debtor's bankruptcy schedules, Quintairos was not on said list. Second, and more problematic, is how Quintairos came by this letter. It is clear from the foregoing that Quintairos could only have come by this letter through the course of discovery while representing PCI and its indemnitees. Quintairos argues that it represented the Debtor and is now claiming to have represented M-Con. In other words, by Quintairos' own admission, Quintairos is using information obtained during the course of representing a client to sue that client. If proven, such actions could give rise to potential counterclaims against Quintairos. The Debtor is investigating this and related conduct and reserves all rights to amend this Complaint or file a separate action to include additional claims arising from Quintairos' prior representation of the Debtor and its affiliates and subsidiaries.

54. Quintairos has violated the automatic stay by filing and refusing to dismiss the Kentucky Lawsuit.

55. Quintairos had actual knowledge of the Bankruptcy Case prior to commencing the Kentucky Lawsuit, as evident from the many references to the Bankruptcy Court record in the complaint filed in the Kentucky Lawsuit.

56. Such knowing violations of the automatic stay are willful.

57. PCPMG has suffered actual damages as the proximate cause of Quintairos' willful stay violations. Such harm includes legal fees and other expenses to respond to the Kentucky Lawsuit and preserve claims that rightfully belong to the Debtor's bankruptcy estate. Since sending Quintairos the initial letter on February 15, 2018, but before filing this lawsuit, the Debtor has incurred no less than $15,000.00, and M-Con has incurred its own fees and expenses. Debtor also seeks all costs and fees in filing and prosecuting this Complaint.

58. The Debtor and its estate have also been harmed by Quintairos' actions because the fees incurred in defending and responding to the Kentucky Lawsuit are funds that would have been available to pay creditors but for Quintairos' stay violations.

59. The Debtor seeks an award for the actual damages caused to the Debtor and its subsidiaries resulting from Quintairos' past and continuing willful violations of the automatic stay.

C. *<u>Count 3 – Injunction of the Kentucky Lawsuit and Other Proceedings</u>*

60. PCPMG repeats and realleges the assertions contained in the foregoing paragraphs 1 – 59 as though fully set forth herein.

61. In the event that this Court determines that the claims asserted in the Kentucky Lawsuit are not stayed by § 362(a) in the Debtor's Bankruptcy Case, PCPMG respectfully

requests an order staying, restraining and/or enjoining Quintairos from continuing the Kentucky Lawsuit, for a period of at least 120 days (without prejudice to further extensions), to allow for the negotiations and confirmation of a plan of reorganization in these cases.

62. Section 105 of the Bankruptcy Code and Rule 65 of the Federal Rules of Civil Procedure (made applicable here by Bankruptcy Rule 7065) give the Bankruptcy Court the power to issue any order, process or judgment that is necessary or appropriate to carry out or enforce the provisions of the Bankruptcy Code. *2 Collier on Bankruptcy* ¶ 105.1 (15th ed. 1988). Section 105 also endows the court with "ample power to enjoin actions excepted from the automatic stay which might interfere in the rehabilitative process whether in a liquidation or in a reorganization case." *In re Johns–Manville Corp.*, 26 B.R. 420, 425 (Bankr.S.D.N.Y.1983) (quoting *2 Collier on Bankruptcy* ¶ 362.05 (15th ed. 1982)). Under section 105, the Bankruptcy Court enjoys considerable authority which it may use to protect the general purpose and intent of the Bankruptcy Code as well as to enforce specific Code provisions.

63. The decision to stay a proceeding pursuant to §105 is within the court's discretion and requires "the balancing of relevant interests." The party seeking the section 105 stay bears the burden of requesting it and of persuasion on the merits.

64. PCPMG is likely to prevail on the merits based on Quintairos' own admission that its claims are based on alleged acts or omissions by the Debtor, not its subsidiary. Moreover, PCPMG is likely to prevail on the merits based on the identity of interests among the Debtor and its non-debtor subsidiaries and affiliates who are being pursued in the Kentucky Lawsuit. There would be no prejudice to Quintairos if the Kentucky Lawsuit is stayed because, among other things, the lawsuit could proceed on its merits (if any) after orderly transition of the Kentucky facilities and confirmation of a plan in the Debtor's Bankruptcy Case. On the other hand, if the

Court does not stay further litigation against M-Con, the Debtor would suffer irreparable harm. Among other things, the Debtor would have to intervene to assert potentially compulsory counterclaims against Quintairos based on the alleged existence of an attorney-client relationship, and such litigation would require substantial attention from the Debtor's and M-Con's employees. Those employees are essential to the transition of PCI's Kentucky and New Mexico facilities, and many individuals may also be essential to the confirmation of a plan in the Debtor's Bankruptcy Case. Further, the time and expense of responding to the lawsuit would severely limit the Debtors' available resources, derailing any chance for a successful reorganization in these Cases.

65. The Debtor has no adequate remedy at law. Neither the Kentucky State Court nor the Kentucky District Court has bankruptcy jurisdiction to determine whether the Kentucky Lawsuit violates the automatic stay and, if so, to issue appropriate relief for the Debtor. Only this Court has such jurisdiction and authority.

66. The public interest supports the requested injunction because, in addition to the above, an injunction will: (i) ensure continued operations of PCI's Kentucky and New Mexico facilities, without interruption, to allow for an orderly transition of such facilities to a new operator; and (ii) provide the Debtors with a chance to effectively and successfully reorganize, which, upon information and belief, will provide the most meaningful and equitable distribution for all claimants who filed timely proofs of claim in the Bankruptcy Case.

67. The Court should therefore issue the requested injunctive relief.

## VI. CONDITIONS PRECEDENT

68. All conditions precedent have been performed or have occurred as required by the applicable rules.

## VII. PRAYER

**WHEREFORE,** PCPMG respectfully requests that the Court: (i) enter a declaratory judgment that the Kentucky Lawsuit violates the automatic stay; (ii) award sanctions against Quintairos to rectify its past transgressions and prevent future violations, including an award of actual damages caused to the Debtor and its subsidiaries as the result of Quintairos' past and continuing willful violations of the automatic stay; (iii) enjoin Quintairos from continuing its prosecution of the Kentucky Lawsuit; and (iv) grant such other relief in favor of the Plaintiffs as may be warranted under the circumstances.

Dated: May 17, 2018

Respectfully submitted,

**DYKEMA COX SMITH**
1717 Main Street, Suite 4200
Dallas, TX  75201
Phone: (214) 462-6400
Fax: (214) 462-6401

By: */s/ Aaron M. Kaufman*
   Mark E. Andrews (TX Bar No. 01253520)
   mandrews@dykema.com
   Jeffrey R. Fine (TX Bar No. 07008410)
   jfine@dykema.com
   Aaron M. Kaufman (TX Bar No. 24060067)
   akaufman@dykema.com
   Jane A. Gerber (TX Bar No. 24092416)
   jgerber@dykema.com

**COUNSEL FOR PLAINTIFFS PREFERRED CARE PARTNERS MANAGEMENT GROUP, LP**